## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ : | |
| REVEREND FATHER : | |
| EMMANUEL LEMELSON, : | No. 24-cv-2415 (SLS) |
| : | |
| *Plaintiff*, : | |
| : | |
| v. : | |
| : | |
| : | |
| SECURITIES AND EXCHANGE : | |
| COMMISSION, : | |
| : | |
| *Defendant.* : | |
| _____ : | |

### PLAINTIFF'S COMBINED REPLY IN FURTHER SUPPORT OF HIS APPLICATION FOR A PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

Russell G. Ryan (DDC Bar No. 414472)
John J. Vecchione (DDC Bar No. 431764)
Andreia Trifoi (DDC Bar App. Pending)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA  22203
(202) 869-5210
russ.ryan@ncla.legal

*Counsel for Plaintiff Rev. Fr. Emmanuel Lemelson*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT SUPPLEMENTAL FACTS ................................................................................. 2

ARGUMENT ............................................................................................................................... 6

    I.    THE COURT HAS SUBJECT MATTER JURISDICTION ................................................. 6

    II.   LEMELSON IS LIKELY TO PREVAIL ON THE MERITS ............................................. 12

        A.   Denial of Article III Adjudication (Claim 2) ................................... 13

        B.   Denial of Jury Trial (Claim 3) ............................................................ 15

        C.   ALJ Removal Protection (Claim 4) ..................................................... 17

    III.  PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED AND NOW URGENT .............................. 18

    IV.  LEMELSON'S AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF ......................... 20

        A.   Deprivation of Due Process (Claim 1) ............................................. 20

        B.   Res Judicata (Claim 5) ........................................................................ 24

CONCLUSION ......................................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*AMG Capital Mgmt., LLC v. FTC*,
  593 U.S. 67 (2021) ................................................................ 22

*Axon Enter. v. FTC* and *SEC v. Cochran*,
  598 U.S. 175 (2023) .................................................. 8, 9, 10, 22

*Blinder, Robinson & Co. v. SEC*,
  837 F.2d 1099 (D.C. Cir. 1988) .......................... 20, 21, 25

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009) ................................................................ 23

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015) .................................................................. 5

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ................................................ 7, 8, 9, 22

*Gabelli v. SEC*,
  568 U.S. 442 (2013) ................................................................ 22

*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015) .................................................. 11

*Johnson v. SEC*,
  87 F.3d 484 (D.C. Cir. 1996) ................................................ 16

*Kokesh v. SEC*,
  581 U.S. 455 (2017) ................................................................ 22

*Liu v. SEC*,
  591 U.S. 71 (2020) .................................................................. 22

*Lucia v. SEC*,
  585 U.S. 237 (2018) ................................................................ 22

*N.Y. Republican State Comm. v. SEC*,
  799 F.3d 1126 (D.C. Cir. 2015) ............................................ 11

*SEC v. Jarkesy*,
  603 U.S. 109 (2024) ........................................................ passim

*SEC v. Posner*,
  16 F.3d 520 (2d Cir. 1994) .................................................... 24

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ................................................................ 22

*United States v. Arthrex*,
  594 U.S. 1 (2021) .................................................................... 22

*Williams v. Pennsylvania*,
  579 U.S. 1 (2016) .................................................................... 23

*Withrow v. Larkin*,
  421 U.S. 35 (1975) ................................................................................................. 21

**Constitutional Provisions**

U.S. Const. Art. III, § 1 ......................................................................................... 13

U.S. Const. Art. III, § 2 ................................................................................. 6, 12, 13

**Statutes**

15 U.S.C. § 78u ......................................................................................................... 5

15 U.S.C. § 78y ......................................................................................................... 7

15 U.S.C. § 80b-3 ............................................................................................. 14, 16

28 U.S.C. § 1331 ................................................................................................. 6, 12

28 U.S.C. § 1367 .....................................................................................................11

**Regulations**

17 C.F.R. § 201.180 .................................................................................................. 5

17 C.F.R. § 201.400 .................................................................................................. 6

**Other Authorities**

*Alan J. Markowitz*,
  Exchange Act Rel. No. 101205 (Sept. 27, 2024) ............................................. 19

*Alpine Sec. Corp.*,
  Exchange Act Rel. No. 102148  (Jan. 10, 2025) ............................................... 19

*Edward F. Hackett*,
  Securities Act Rel. No. 11310 (Sept. 27, 2024) ............................................... 19

*Halpern & Assocs.*,
  Exchange Act Rel. No. 101504 (Nov. 1, 2024) ................................................ 19

Hannah Lang and Chris Prentice,
  "US securities regulator to drop lawsuit against Coinbase, firm says,"
  Reuters, Feb. 21, 2025 4:29 p.m. EST ............................................................. 19

*Ira S. Viener*,
  Exchange Act Rel. No. 101203 (Sept. 27, 2024) ............................................. 19

*Jason Jianxun Tang*,
  Exchange Act Rel. No. 101204 (Sept. 24, 2024) ............................................. 19

Javier Shekhawat,
  "US securities regulator closes investigation into Robinhood's crypto arm with no action,"
  Reuters, Feb. 24, 2025 11:05 a.m. EST ............................................................ 19

*Jia Roger Qian Wang*,
  Exchange Act Rel. No. 101214 (Sept. 24, 2024) ............................................. 19

*Joshua Abrahams*,
  Exchange Act Rel. No. 34-101505 (Nov. 1, 2024)................................................................... 19

*Paul L. Chancey*,
  Exchange Act Rel. No. 101208 (Sept. 27, 2024) .................................................................... 19

*Pending Administrative Proceedings*,
  Securities Act. Rel. No. 11198 (June 2, 2023) ...................................................................... 19

Philip F.S. Berg,
  Note: *Unfit to Serve: Permanently Barring People from Serving as Officers and Directors of
  Publicly Traded Companies After the Sarbanes-Oxley Act*,
  56 VANDERBILT L. REV. 1871 (2003).................................................................................... 24

*Robert Lewis Carver*,
  Exchange Act Rel. No. 102252 (Jan. 22, 2025) .................................................................... 19

SEC Data Delivery Standards,
  https://www.sec.gov/files/sec-dds-july-2024.pdf .................................................................... 5

## PRELIMINARY STATEMENT

Plaintiff, the Reverend Father Emmanuel Lemelson, respectfully submits this combined (1) reply memorandum of points and authorities supporting his application for a preliminary injunction and (2) memorandum of points and authorities opposing Defendant Securities and Exchange Commission's motion to dismiss the Amended Complaint.

Lemelson's motion for a preliminary injunction should be granted immediately, and thereafter SEC's motion to dismiss Lemelson's Amended Complaint should be denied in the ordinary, more deliberate course. This Court has subject matter jurisdiction to adjudicate this case—and thus to grant immediate preliminary injunctive relief—because the case presents federal claims arising under the Constitution and laws of the United States. In addition, each of Lemelson's claims states a cognizable cause of action.

Finally, the need for immediate preliminary injunctive relief (now akin to an emergency motion) has become increasingly acute in recent weeks.[1] Instead of voluntarily pausing the parallel administrative enforcement prosecution being challenged in this case to allow the Court time to rule on the constitutional legitimacy of the proceeding, SEC and its staff prosecutors and administrative law judge ("ALJ") are now *accelerating* their pace and burden of prosecutorial activity. This transparent attempt to rush as much unconstitutional prosecutorial activity as possible against Lemelson, before this Court has a sufficient opportunity to consider the merits of Lemelson's challenges, further demonstrates the punitive nature of the SEC proceeding and the urgent need to immediately pause it.

---

[1] Lemelson initially sought only a preliminary injunction rather than an emergency order because, at the time, the only materially burdensome and intrusive prosecutorial action he was facing was a hearing scheduled to begin before an SEC administrative law judge in July 2025. As described in the ensuing pages, however, that is no longer the case; irreparable constitutional harm is now imminent, and SEC—along with its own staff prosecutors and administrative law judge—appear unwilling to wait for this Court's judgment in this matter on any relevant issue.

Under the circumstances, and with briefing now complete on Lemelson's motion for a preliminary injunction, Lemelson urges the Court to decouple its consideration of the parties' separate motions and immediately grant Lemelson's requested preliminary injunction without waiting for completion of briefing and deliberation on SEC's non-exigent motion to dismiss. Although the parties agreed to combined briefing of these two wholly separate motions as a matter of convenience and judicial economy, there is no reason to withhold preliminary injunctive relief solely because briefing of the separate and ordinary-course motion to dismiss has not yet been completed.

## RELEVANT SUPPLEMENTAL FACTS

Pages 2 through 11 of Lemelson's memorandum in support of his application for a preliminary injunction, and its supporting declaration, together set forth the largely undisputed material facts relevant to both SEC's Lemelson's preliminary injunction application and SEC's motion to dismiss, and those facts are not repeated here. ECF No. 11. With one exception, moreover, Lemelson does not quibble with SEC's counterstatement of facts. SEC Br., ECF No. 13-1, at 2–7. Lemelson summarizes below certain more recent facts that have materially increased the certainty of imminent irreparable harm to Lemelson and the urgency of preliminary injunctive relief to stop it.

Just two weeks after Lemelson moved for a preliminary injunction asking this Court to pause SEC's administrative enforcement prosecution (and the parties herein then stipulated to an orderly briefing schedule), SEC staff prosecutors unexpectedly demanded that the SEC ALJ issue all-new subpoenas that would require Lemelson to submit to yet another deposition and to search for and produce 18 new categories of documents concerning his private communications and business affairs dating all the way back to 2020. *See* Order on Subpoena Request, *In re Lemelson*, SEC Admin. Proc. Rulings Rel. No. 6921, at 3 (Jan. 30, 2025), *available at*

https://www.sec.gov/files/alj/aljorders/2025/ap-6921.pdf (the "Subpoena Order").[2]    SEC staff prosecutors had not previously requested *any* discovery in the nearly three-year-old SEC administrative proceeding challenged by this lawsuit.  To the contrary, only two months after launching the administrative proceeding in April 2022, those prosecutors filed a motion for "summary disposition" (a rough SEC administrative analog to summary judgment), assuring all involved that there were no remaining facts in genuine dispute.  That absence of any need for further discovery was obvious, because SEC and its prosecutors have been investigating and prosecuting Lemelson for more than a decade.  During that time, they have already subjected him to seven total days of sworn interrogation (including three days of pre-litigation investigative testimony, two days of pretrial deposition testimony during the litigation, and two days of trial testimony), obtained every plausibly relevant document he ever possessed or controlled, and even recovered and scoured his computer hard drive.  In short, SEC had already scorched every patch of earth in its relentless decade-long pursuit of Lemelson.

Yet as soon as Lemelson sought preliminary injunctive relief from this Court to pause SEC's administrative prosecution, and then agreed to an orderly briefing schedule on his application, SEC staff prosecutors abruptly shifted gears and scrambled to restart the discovery machine before this Court had a chance to pause it.  The SEC ALJ initially denied his SEC colleagues' deposition subpoena *sua sponte*, *see In re Lemelson*, SEC Admin. Proc. Rulings Rel. No. 6913  (Jan. 2, 2025), *available at* https://www.sec.gov/files/alj/aljorders/2025/ap-6913.pdf, and on Lemelson's subsequent motion to quash the prosecutors' requested document subpoena, the ALJ disallowed some of his colleagues' most excessive overreaches, *see* Subpoena Order at

---

[2] Most (but inexplicably not all) of the pleadings and rulings in the SEC administrative proceeding are available on SEC's website at https://www.sec.gov/enforcement-litigation/administrative-proceedings/3-20828.

3–4.  But the SEC ALJ still approved and issued a sweeping, intrusive, and burdensome version of his colleagues' requested subpoena, which still demands that Lemelson search for and turn over reams of private papers and correspondence that date back to 2020 and have no conceivable relevance to SEC's administrative prosecution of Lemelson.  *See id*.  Lemelson's deadline for complying with this subpoena is March 5, 2025 (nearly a week before the close of briefing on SEC's separate motion to dismiss).

As explained in Lemelson's Amended Complaint and initial brief, the *sole* predicate fact upon which SEC's administrative prosecution is based is an injunction entered against Lemelson by a Massachusetts federal court in March 2022, which in turn was based entirely on events that happened *more than a decade ago*—specifically, three isolated sentences (or sentence fragments) uttered *in public* by Lemelson in 2014 (two of which concerned a pre-operational nonpublic company he never traded in), which SEC cherry-picked from his voluminous *public* commentaries that year about a publicly traded corporation called Ligand Pharmaceuticals, Inc.  And the Massachusetts jury flatly rejected *all* of SEC's claims of fraud, as well as *all* of SEC's claims relating to Lemelson's communications and business dealings with his own investors.  Thus, not only was the predicate injunction limited exclusively to events in 2014; it had nothing whatsoever to do with Lemelson's private communications and affairs or his interactions with his own investors even back then, much less from 2020 to the present.

Yet the ALJ's subpoena goes well beyond requiring Lemelson to search for and produce private papers having no temporal or subject matter relevance to the current SEC administrative prosecution.  It also purports to require Lemelson to continually produce any and all responsive private information *going forward*, whenever that information might be created or received in the future, thereby effectively subjecting Lemelson's ongoing private communications to ongoing,

4

real-time surveillance and monitoring by SEC's ALJ and prosecutors.[3]  The subpoena also purports to require Lemelson to convert all his responsive documents from their existing state to an electronic format mandated by SEC's "Data Delivery Standards"—an 11-page, fine-print muddle of technical jargon that no ordinary person could possibly comply with, or even comprehend, without retaining the services of expensive, technologically savvy expert consultants.  *See* SEC Data Delivery Standards, https://www.sec.gov/files/sec-dds-july-2024.pdf.

All this without first obtaining a search warrant or any other prior judicial authorization of any kind.  *Cf. City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) ("the [Supreme] Court has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are per se unreasonable … subject only to a few specifically established and well-delineated exceptions'" (cleaned up, alterations in original, and internal citation omitted)); *id.* at 420 ("in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker").  Due to the extraordinary (and likely unprecedented) nature of the SEC ALJ's subpoena, the range of potential consequences for noncompliance by Lemelson is not entirely clear.  But the potential consequences appear to include, among other things, Lemelson being excluded from his hearing before the ALJ on the merits, Lemelson being sued by SEC in federal court to enforce his compliance, and/or Lemelson being criminally prosecuted and fined up to $1,000 and incarcerated for up to a year.  *See* 15 U.S.C. § 78u(c); 17 C.F.R. § 201.180(a).

Lemelson has repeatedly asked SEC and the ALJ to pause their administrative prosecution, but those requests have been denied at the behest of SEC staff prosecutors.  Most recently,

---

[3] This extraordinary obligation presumably will end at the conclusion of the hearing before the ALJ in July, but nothing in the subpoena expressly says so.

Lemelson asked the ALJ at least to certify his Subpoena Order for interlocutory review by the SEC commissioners, but the ALJ denied that request too. *See* Order Denying Certification for Interlocutory Review, *In re Lemelson*, SEC Admin. Proc. Rulings Rel. No. 6927 (Feb. 20, 2025), *available at* https://www.sec.gov/files/alj/aljorders/2025/ap-6927.pdf. Lemelson anticipates filing directly with the SEC commissioners early this week a petition for interlocutory review notwithstanding the ALJ's refusal to certify the matter, but SEC internal rules discourage such petitions as being "disfavored" and granted only in "extraordinary circumstances." 17 C.F.R. § 201.400(a).

## ARGUMENT

## I.    THE COURT HAS SUBJECT MATTER JURISDICTION

The Court should deny SEC's motion insofar as it seeks summary dismissal of two of Lemelson's five claims for purported lack of subject matter jurisdiction. SEC Br. at 9–14. SEC does not (and cannot) challenge the Court's subject matter jurisdiction to adjudicate this *case*, nor any of Lemelson's three other federal claims, including two that support his application for a preliminary injunction. Indeed, the Court's subject matter jurisdiction is obvious from the literal text of the Constitution and the general statutory grant of federal question jurisdiction dating back to 1875. U.S. Const. Art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution…"); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). This case indisputably raises *federal* constitutional challenges to a *federal* agency's administrative proceeding being conducted pursuant to a *federal* statute based on an injunction issued by a *federal* court in a parallel *federal* court proceeding that was litigated pursuant to other *federal* statutes. Those facts justify federal question jurisdiction over this case on many levels.

SEC nonetheless argues that the Court lacks subject matter jurisdiction to adjudicate two of Lemelson's five federal claims—the jury trial challenge he asserts in his third claim and the res judicata challenge he asserts in his fifth.  SEC Br. at 9–14.  SEC urges the Court to sever and dismiss those two federal claims for lack of jurisdiction, even as the Court exercises undisputed jurisdiction over all of Lemelson's other federal claims.  Despite the obvious illogic of that inefficient piecemeal approach, SEC insists that Section 213(a) of the Investment Advisers Act ("Advisers Act") reflects a "fairly discernible" intent to "channel" these two claims through a years-long statutory review scheme that begins with an initial ruling by an SEC ALJ, followed (in rare cases) by theoretical SEC appellate review of the ALJ's initial decision, followed (in even rarer cases) by theoretical federal appellate court review of SEC's final order if, but only if, that final order "aggrieve[s]" Lemelson.  *See* SEC Br. at 9–10 (citing 15 U.S.C. § 80b-13(a)).  SEC is wrong for at least two independent reasons.

First and foremost, SEC's jurisdictional challenge is foreclosed by two controlling Supreme Court decisions that recently analyzed a statutory review provision—Section 25(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78y(a)—that is, for all relevant purposes, identical to the one SEC relies upon here.  In both precedential cases, the Court flatly rejected SEC's interpretation of the statute.  In *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010), an accounting firm preemptively challenged the constitutionality of the Public Company Accounting Oversight Board ("PCAOB") without first enduring a years-long PCAOB administrative prosecution and then appealing any imposed sanctions to SEC.  The Court squarely held that district courts have subject matter jurisdiction to adjudicate lawsuits, like Lemelson's, that challenge the structural constitutionality of a federal regulator's adjudication system.  561 U.S. at 489.  The only difference between that case and this one—which is of no legal consequence—

was that the initial adjudication in that case would have been performed by a private quasi-governmental corporation (of still-dubious constitutional legitimacy), rather than by an SEC ALJ (of still-dubious constitutional legitimacy), before becoming eligible for hypothetical SEC appellate review and then, finally, at some distant point in time, hypothetical judicial review.

The *Free Enterprise Fund* Court held that jurisdiction over such quintessential federal questions is conferred by 28 U.S.C. §§ 1331 and 2201. *See* 561 U.S. at 489. And, as the Court further held, contrary to SEC's argument here, jurisdiction is neither expressly nor implicitly limited by Exchange Act Section 25(a), which does not even come into play unless and until a party is "aggrieved by" a final order issued by the SEC. *Id.* Here, as in *Free Enterprise Fund*, there is no final SEC order from which Lemelson could seek review under Section 25(a), *and there may never be one.* Indeed, there is not yet even an initial decision by SEC's ALJ, much less one unfavorable to Lemelson, and there likewise may never be one of those either. Thus, the possibility of future judicial review of any final SEC order is entirely hypothetical and speculative at this point, just as it was in *Free Enterprise Fund*.

Lest there were any doubt that *Free Enterprise Fund* is dispositive here, the Supreme Court revisited Exchange Act Section 25(a) just two years ago in *Axon Enterprise, Inc. v. FTC* and its companion case, *SEC v. Cochran*, 598 U.S. 175 (2023) ("*Axon/Cochran*"). And the Court came to the identical conclusion. The Court again squarely held that the district court had jurisdiction to adjudicate a preemptive challenge to the constitutionality of SEC's administrative adjudication process. *Axon/Cochran*, 598 U.S. at 195–96. In doing so, moreover, the Court soundly rejected the same arguments SEC made in *Free Enterprise Fund*—and trots out again here—concerning the proper application of so-called *Thunder Basin* factors. *Id.* at 189; *see also id.* at 205–07 (Gorsuch, J., concurring in judgment) (explaining why the *Thunder Basin* factors are unworkable).

There is no meaningful distinction between these two controlling precedents and this case on the question of subject matter jurisdiction. All feature the exact same kind of statutory review scheme, which *Free Enterprise Fund* and *Axon/Cochran* squarely held does *not* reflect any "fairly discernible" intent to channel structural constitutional challenges into. *Free Enter. Fund*, 561 U.S. at 489 (Section 25(a) "does not expressly limit the jurisdiction that other statutes confer on district courts …, [n]or does it do so implicitly."); *Axon/Cochran*, 598 U.S. at 196 ("The claims are not 'of the type' the statutory review schemes reach.").

Moreover, just as in *Free Enterprise Fund* and *Axon/Cochran*, SEC's preferred hypothetical statutory review scheme is not even applicable here, because SEC has not yet issued any final order that would trigger it, or would even permit Lemelson to invoke it—*and there is no certainty that any such order will ever be issued*. Just as in *Axon/Cochran*, Plaintiff here asserts the "here-and-now injury" of being subjected to "an illegitimate proceeding, led by an illegitimate decisionmaker"—an injury that becomes irremediable if the claim must await conclusion of the proceeding. *Axon/Cochran*, 598 U.S. at 191 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020)). And as previously noted, it is entirely possible that SEC might never issue a final order that aggrieves Lemelson, in which case his ability to seek judicial review under the statutory review scheme would *never* materialize. In that event, under SEC's preferred approach, Lemelson would be forever deprived of *any* opportunity to seek even after-the-fact judicial review of his constitutional deprivations, much less the "meaningful" judicial review required by *Thunder Basin*.

To the extent SEC attempts to distinguish *Free Enterprise Fund* and *Axon/Cochran* by arguing those cases alleged *structural* separation of powers violations—primarily the excessive tenure protections enjoyed by agency officers, which SEC now suddenly admits with respect to its

ALJ—whereas Lemelson alleges a structural jury-trial deprivation, that distinction makes no material difference.  Either way, the claimed structural defect is baked into the essential machinery of SEC's follow-on enforcement apparatus.  It taints every case that enters it, with the resulting injury being the same "here-and-now" injury of being subjected to "an illegitimate proceeding, led by an illegitimate decisionmaker," an injury that cannot be undone or remedied after the fact.  *Axon/Cochran*, 598 U.S. at 191 (quoting *Seila Law*, 591 U.S. at 212).  Indeed, *Axon/Cochran* also held that a separate due process claim asserted by one of the petitioners—challenging the combination of prosecutorial and adjudicative functions in one agency—was likewise within the district court's subject-matter jurisdiction.  *Id*. at 189 ("Axon's combination-of-functions claim similarly goes to the core of the FTC's existence, given that the agency indeed houses (and by design) both prosecutorial and adjudicative activities."); *id*. at 194 ("And Axon's constitutional challenge to the combination of prosecutorial and adjudicative functions is of a piece—similarly distant from the FTC's 'competence and expertise.'") (quoting *Free Enter. Fund*, 561 U.S. at 491)).

Here too, SEC's follow-on enforcement prosecution systematically, and by design, deprives *all* litigants of their constitutional right to defend themselves in an Article III forum, before an unbiased court and a jury.  That is the crux of Plaintiff's third claim (and second), and that defect is no less structural than the combination-of-functions claim in *Axon* or the removal-protection claims in *Free Enterprise Fund*, *Axon*, and *Cochran*.  Likewise, SEC's follow-on enforcement proceedings, when predicated on court injunction orders the SEC itself previously obtained after fully litigating a separate federal court proceeding, should always be precluded by well-settled principles of res judicata if SEC did not ask or convince the court to include an industry bar or suspension as part of the injunction.

SEC cites two D.C. Circuit cases—*N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126 (D.C. Cir. 2015) and *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)—in purported support of its effort to evade the Supreme Court's holdings in *Free Enterprise Fund* and *Axon/Cochran*, SEC Br. at 10–11, but neither case can perform that function. Both cases were decided *before* the Supreme Court decided *Axon/Cochran*, and *Axon/Cochran* overruled the D.C. Circuit decision in *Jarkesy* in every meaningful sense, with the Supreme Court squarely rejecting virtually every material premise, syllogism, and other line of reasoning the D.C. Circuit relied upon in that case. In addition, the *N.Y. Republican State Committee* case is easily distinguished; it involved a challenge to SEC rulemaking (not an enforcement proceeding) and, more importantly, the petitioner sought review of an SEC order that was undeniably a *final* order, thus rendering the statutory review provision indisputably the only proper and viable path to judicial review. By contrast, as discussed above, the SEC here has entered *no* final order, thus categorically prohibiting Lemelson from invoking the statutory review scheme despite his here-and-now injury of being hailed before an unlawful adjudicator.

Finally, even if Plaintiff's structural jury trial and res judicata claims—in a vacuum—were beyond the Court's subject matter jurisdiction, the Court would still have "supplemental" jurisdiction to adjudicate them because the Court indisputably has jurisdiction to adjudicate all of Lemelson's other claims, which arise from the same nucleus of operative facts: SEC's unlawful prosecution of Lemelson in its follow-on administrative enforcement proceeding. *See generally* 28 U.S.C. § 1367 ("district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"). The supplemental jurisdiction statute recognizes that district courts have subject-matter jurisdiction over "cases"—that is, civil "actions" rather than individual

claims—arising under the Constitution and laws of the United States, U.S. Const. Art. III, § 2; 28 U.S.C. § 1331, and this is indisputably such a case.  Moreover, although supplemental jurisdiction is typically invoked for *state-law* claims over which a district court would *never* have jurisdiction but for the related federal claims asserted in the same complaint, nothing in the supplemental jurisdiction statute (nor the Supreme Court precedent it codified) remotely suggests that supplemental jurisdiction is prohibited when the related claims are indisputably *federal* claims over which the court would have original jurisdiction but for a judicially crafted and implied limitation such as the *Thunder Basin* exception.  If anything, related federal claims are *more* deserving of coverage by supplemental jurisdiction than state law claims which, standing alone, could *never* be entertained by *any* federal court.  There is no legal or logical reason for this Court to exercise indisputable subject matter jurisdiction over three of Plaintiff's five structural constitutional claims while severing the other two and consigning them to the hypothetical, years-long statutory review process that might never materialize.

## II.    LEMELSON IS LIKELY TO PREVAIL ON THE MERITS

Lemelson's application for a preliminary injunction focused on his likelihood of success on three of his five claims.  We address each in turn below.  Notably, SEC does not dispute this Court's subject-matter jurisdiction over two of those three claims—to wit, his claims that SEC's administrative prosecution deprives him of an Article III adjudication (Claim 2 of the Amended Complaint) and that SEC's ALJ is protected from multiple layers of tenure protection in violation of Article II (Claim 3 of the Amended Complaint).  Moreover, SEC's recently filed Notice of Change in Position in this case now concedes, as Lemelson alleges, that the relevant statutory scheme that cloaks the ALJ with excessive tenure protection (which Congress has not repealed) violates Article II.  *See* ECF No. 16.

### A.  Denial of Article III Adjudication (Claim 2)

Lemelson's likelihood of success on his Article III claim is confirmed—and SEC's bid to dismiss it foreclosed—by *SEC v. Jarkesy*, 603 U.S. 109 (2024), the Supreme Court's most recent and most authoritative decision on the relevant issue.  SEC's reliance on any pre-*Jarkesy* cases is categorically misplaced.  Citing longstanding precedent, the Court in *Jarkesy* confirmed that regardless of whether the Seventh Amendment *also* guarantees a jury trial, all subjects of suits at common law must be decided by Article III courts.  "The Constitution prohibits Congress from 'withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law.'"  *Id.* at 127 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)).  Thus, "[o]nce such a suit 'is brought within the bounds of federal jurisdiction,' an Article III court must decide it, with a jury if the Seventh Amendment applies." *Id.* (quoting *Stern v. Marshall*, 564 U.S. 462, 484 (2011)).  Stated otherwise, under the constitutional design of tripartite government and separation of powers, the judicial power "cannot be shared with the other branches."  *Id.* (quoting *Stern*, 564 U.S. at 483).

To state the obvious, SEC is not an Article III court, and none of its commissioners, ALJs, or other adjudicators are life-tenured judges.  Nor can SEC or its personnel plausibly claim to possess *any* judicial power under Article III of the Constitution, because Article III vests *all* of that judicial power *solely* in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. Art. III, § 1.   And that judicial power extends to "*all* Cases, in Law and Equity, arising under this Constitution [or] the Laws of the United States." *Id.* § 2 (emphasis added).

The ongoing SEC administrative prosecution of Lemelson challenged in this lawsuit is unquestionably a case arising under the laws of the United States.  The first sentence of the SEC

order that initiated the prosecution could not be clearer, saying the prosecution was "instituted pursuant to Section 203(f) of the Investment Advisers Act of 1940," which is part of the U.S. Code. 15 U.S.C. § 80b-3(f); *see* Order Instituting Proceedings, *In re Lemelson*, SEC Investment Advisers Act Rel. No. IA-6000, at *1 (Apr. 20, 2022).   To the extent SEC's brief repeatedly (and erroneously) insists that the administrative prosecution seeks only "equitable" remedies, SEC Br. at 1, 18, 19, 20, that makes no difference with respect to the need for Article III adjudication because, as noted above, Article III vest exclusively in federal courts the power to adjudicate *all* cases in *both* "Law and Equity."

Faced with that insurmountable constitutional constraint, SEC predictably seeks refuge, as it did in *Jarkesy*, within the ever-evaporating "public rights exception" to Article III judicial power. SEC Br. at 21–24.  But SEC's reliance on this narrow and oft-criticized exception is also foreclosed by *Jarkesy*.

Under whatever remains of the public rights exception, Congress may assign certain cases to agencies for adjudication outside of Article III and without jury trials.  *See generally Jarkesy*, 603 U.S. at 127–32 (discussing the exception); *see also id.* at 173–75 (Sotomayor, J., dissenting) (articulating a more sweeping version of the exception that the majority soundly rejected). But under any fair reading of *Jarkesy*, the Court effectively emasculated the public rights exception without expressly overruling it.  The Court admitted that the exception "has no textual basis in the Constitution," *id.* at 131, and that one of the Court's most expansive precedents supporting the exception—*Atlas Roofing Co. v. Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977), upon which SEC heavily relies here—was "a departure from our legal traditions" and has been widely criticized or "simply ignored" by scholars and commentators.  603 U.S. at 138 n.4.  At best, the Court made clear that whatever lingering vestiges of the public rights exception

14

remain after *Jarkesy*, the exception is strictly limited to cases involving revenue collection, foreign commerce, immigration, tariffs, relations with Indian tribes, and the granting of public benefits. *Id.* at 128–30.  Given the *Jarkesy* Court's strong admonition against judicial expansion of the exception beyond these limited categories, this Court should decline SEC's suggestion to expand it to cover punitive law enforcement adjudications in SEC's home-court tribunals.

### B.  Denial of Jury Trial (Claim 3)

Lemelson's jury-trial claim is also likely to succeed—and SEC's bid to dismiss it doomed to fail—because of *Jarkesy* and the plain text of Article III.  SEC's argument is premised almost entirely on its erroneous contention that SEC's administrative prosecution of Lemelson seeks only "equitable" remedies in the form of a bar or suspension from the securities industry.  But as explained in the preceding section of this brief, SEC simply has no constitutional power to impose equitable remedies, because Article III vests power to adjudicate cases both "in Law and Equity" exclusively in federal courts.  Thus, the notion of an executive branch administrative agency dispensing "equitable remedies" is an oxymoron.  Either the case is one in equity, in which event the Constitution requires it to be adjudicated by an Article III court, or the case may constitutionally be adjudicated outside of an Article III court, in which event the case cannot—by definition—be a case in equity.  Thus, even if SEC were correct that a bar or suspension from the securities industry—the sanction sought in SEC's administrative prosecution—is an "equitable remedy," such that Lemelson could theoretically be denied a jury trial, that doesn't help the SEC here, because the case would still need to be adjudicated by an Article III court.

SEC inadvertently proves this point by repeatedly analogizing statutory bars and suspensions to court injunctions while admitting that such injunctions were "the province of the courts of equity when the Seventh Amendment was ratified."  SEC Br. at 19.  And ironically, as

explained in Lemelson's res judicata claim, SEC already had its full and fair opportunity to seek equitable remedies when it sued Lemelson in federal court. Indeed, it knew it needed to litigate in federal court if it wished to secure *any* injunction, because it also knew that a federal court is the only place it could legitimately obtain an injunction or any other equitable relief. That SEC declined, when it had the chance, to request that its court injunction include an industry bar or suspension does not mean that unilaterally imposing such a bar or suspension now, in its own Article II proceeding, can somehow be equated with an equitable injunction.

In any event, SEC's prosecution does *not* seek to impose an injunction or any other "equitable" sanction. It seeks a statutory penalty in the form of a suspension or permanent bar from the securities industry pursuant to Section 203(f) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-3(f). It makes no difference that this statutory penalty is non-monetary. Such a penalty would plainly deprive Lemelson of his private liberty and property rights by restricting him from his chosen profession and chosen means of making a living, and by destroying the business he has built and operated over many years along with his ability to earn a future living through that business. Moreover, the penalty would be imposed at least in part to punish and deter, and it would—especially being imposed more than a decade after the events that led to SEC's prosecution—do nothing to "restore the status quo," so it could "make no pretense of being equitable." *Jarkesy*, 603 U.S. at 124 (quoting *Tull v. United States*, 481 U. S. 412, 422 (1987)); *cf. Johnson v. SEC*, 87 F.3d 484, 488-89 (D.C. Cir. 1996) (SEC administrative censure and six-month industry suspension were punitive sanctions and thus a "penalty" within the meaning of the then-applicable statute of limitations). A proceeding threatening to impose such a non-monetary penalty is no different for Seventh Amendment purposes than the proceeding that imposed monetary penalties in *Jarkesy*.

### C.  ALJ Removal Protection (Claim 4)

Of all the issues addressed in the argument section of its brief, SEC devoted by far the most ink—more than a quarter of the entire brief—to the task of convincing the Court that the multiple layers of tenure protection enjoyed by its ALJ presented no constitutional concerns.  SEC Br. at 24–35.  Yet just days before the due date for Lemelson's responsive brief, as previously noted, SEC filed a "Notice of Change in Position" that essentially conceded liability on this claim.  ECF No. 16 (filed Feb. 18, 2025).  This after SEC had been adamantly insisting for the better part of the past decade, in *Jarkesy* and elsewhere, that those tenure protections were of no constitutional concern.  Yet now, shortly after Lemelson sought preliminary injunctive relief from this Court based in part on his likelihood of success on this claim, and after having argued in its opening brief in this case that Lemelson's claim was meritless, SEC has belatedly channeled its inner Gilda Radner to tell Lemelson and the Court:  "Never mind."  In short, Lemelson is not only likely to succeed on this claim; he has already succeeded.[4]

Despite this extraordinary concession, however, SEC summarily suggests in its Notice that Lemelson's removal-protection claim should nevertheless be dismissed, and preliminary injunction relief denied, because the Acting Solicitor General "will no longer defend" the statutory scheme that continues to codify the constitutional taint surrounding the legitimacy of the SEC ALJ's power to issue commands to Lemelson and to superintend SEC's administrative prosecution against him.  The Court should reject SEC's suggestion that the ALJ's constitutionally illegitimate tenure protection has been cured by its Notice.  It has not been cured.  The statutory scheme that

---

[4] SEC's forthcoming reply brief may improperly seek to introduce new arguments on the merits of Lemelson's removal-protection claim in light of the agency's recent confession of error.  Should SEC do so, and to the extent the Court is inclined to consider such belated arguments in a reply brief (and after Lemelson's prior application for a preliminary injunction has now been fully briefed), Lemelson respectfully requests and opportunity to file a sur-reply to respond to any such new arguments.

codifies the ALJ's tenure protection still exists unrepealed, regardless whether the temporary Acting Solicitor General—who could be replaced with a permanent Solicitor General at any time—intends to "defend" it in court.  Unless and until this Court declares the ALJ's multi-level tenure protections unconstitutional and enjoins the ALJ from continuing to issue unreviewable subpoenas and other compulsory edicts against Lemelson, Lemelson is entitled to judicial relief to stop the ALJ from doing so.

At a minimum, the Court should not summarily dismiss Lemelson's claim at this early stage just because SEC has now conceded that the claim is meritorious.  At this stage of the litigation (before any discovery or trial), and with the parallel ALJ proceeding still underway and inflicting day-to-day, here-and-now constitutional injury, Lemelson has no burden to prove that the ALJ's tenure protection has inflicted or will inflict "compensable harm" on Lemelson.  SEC Notice of Change in Position at 1 (quoting *Collins v. Yellen*, 594 U.S. 220, 259 (2021)).  Especially given SEC's recent confession that Lemelson's claim was meritorious all along, that claim should be allowed to proceed in the ordinary course, with the appropriate remedy to be determined after discovery and full adjudication of the merits.

## III.    PRELIMINARY INJUNCTIVE RELIEF IS WARRANTED AND NOW URGENT

In light of the recent events detailed earlier in this brief, immediate preliminary injunctive relief is now urgently needed, as the threat of imminent, irreparable harm is now a virtual certainty.  SEC, its prosecutorial staff, and its ALJ—acting in concert—have made clear they have no interest in waiting for this Court to rule on the constitutionality of their parallel administrative proceeding they are prosecuting against Lemelson.  To the contrary, after years of SEC lethargy, lassitude, and inaction, as soon as Lemelson sought this Court's help, SEC and its staff went into overdrive to rush its proceeding before this Court has a chance to stop it.

The balance of harms and public interest factors also now tip even more decidedly in Lemelson's favor. SEC offers no serious argument that temporarily pausing its follow-on prosecution against Lemelson—which is predicated on events that ended in 2014 and which SEC could have commenced at any time since then but waited until 2022 to commence (and then let languish for more than two years)—would jeopardize its regulatory mission or the public interest.[5] On the other hand, Lemelson is facing imminent initiation of unconstitutional government monitoring and surveillance of his recent and ongoing private communications and private business affairs having nothing whatsoever to do with the events in 2014, all demanded by unaccountable government actors who are prosecuting and superintending a constitutionally illegitimate proceeding against him. This case, and the requested preliminary injunction, are Lemelson's only effective means of judicial protection from the SEC dragnet that has ensnared him for more than a decade based on three purported misstatements (two of which concerned a pre-operational nonpublic company Lemelson never traded) among his voluminous public reports and commentary that criticized a publicly traded corporation back in 2014.

---

[5] As recent headlines and other, more obscure SEC administrative orders reveal, SEC has been voluntarily pausing (and even dismissing) numerous other cases of far more significant than its decade-old pursuit of Lemelson. *See, e.g.*, Javier Shekhawat, "US securities regulator closes investigation into Robinhood's crypto arm with no action," Reuters, Feb. 24, 2025 11:05 a.m. EST; Hannah Lang and Chris Prentice, "US securities regulator to drop lawsuit against Coinbase, firm says," Reuters, Feb. 21, 2025 4:29 p.m. EST; *Robert Lewis Carver*, Exchange Act Rel. No. 102252 (Jan. 22, 2025) (unexplained dismissal of follow-on proceeding against a respondent who was convicted of criminal identity-theft and fraud and subject to at least two separate injunctions in civil cases brought by the Commission); *Alpine Sec. Corp.*, Exchange Act Rel. No. 102148 (Jan. 10, 2025) (unexplained dismissal of follow-on proceeding against recidivist penny-stock firm predicated on court injunction based on 2,720 violations of Commission's anti-money-laundering record-keeping rules); *Halpern & Assocs.*, Exchange Act Rel. No. 101504 (Nov. 1, 2024) (unexplained dismissal of Rule 102(e) proceeding against recidivist audit firm and principal accused for the second time with improper professional conduct); *Joshua Abrahams*, Exchange Act Rel. No. 34-101505 (Nov. 1, 2024) (unexplained dismissal of Rule 102(e) proceeding); *Edward F. Hackett*, Securities Act Rel. No. 11310 (Sept. 27, 2024) (similar); *Paul L. Chancey*, Exchange Act Rel. No. 101208 (Sept. 27, 2024) (similar); *Alan J. Markowitz*, Exchange Act Rel. No. 101205 (Sept. 27, 2024) (similar); *Ira S. Viener*, Exchange Act Rel. No. 101203 (Sept. 27, 2024) (similar); *Jia Roger Qian Wang*, Exchange Act Rel. No. 101214 (Sept. 24, 2024); *Jason Jianxun Tang*, Exchange Act Rel. No. 101204 (Sept. 24, 2024) (similar); *see also Pending Administrative Proceedings*, Securities Act. Rel. No. 11198 (June 2, 2023) (dismissing 42 pending proceedings en masse with no decision on the merits).

**IV.    LEMELSON'S AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF**

By its separate motion, SEC seeks dismissal of all claims in Lemelson's Amended Complaint, purportedly for failure to state a claim.  As demonstrated in the preceding section of this brief, however, not only has Lemelson stated valid claims that he is being deprived of his constitutional rights to an Article III adjudication (Claim 2), to a trial by jury (Claim 3), and to be free from the ongoing commands of an unconstitutionally tenured ALJ (Claim 4), he also is likely to succeed on those claims.  In the sections below, therefore, Lemelson addresses only why he has also stated valid claims that he is being deprived an unbiased adjudicator in violation of due process (Claim 1) and being administratively prosecuted in violation of well-settled principles of res judicata (Claim 5).

**A.  Deprivation of Due Process (Claim 1)**

As SEC's brief points out, SEC Br. at 16, Lemelson has acknowledged from the start that his due process claim is in tension with *Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099 (D.C. Cir. 1988),[6] which vastly expanded upon the Supreme Court's decision in *Withrow v. Larkin*, 421 U.S. 35 (1975).[7]  In dismissing a similar due process challenge in *Blinder*, the D.C. Circuit repeatedly emphasized the Supreme Court's tendency in that long-bygone era to accord wide leeway and deference to administrative agencies and to invoke various uncodified default presumptions of honesty, integrity, and impartiality in favor of agencies and their personnel.  *See id.* at 1106 n.7 ("our law assumes integrity" of government officials); *id.* at 1107 (invoking a "presumption of honesty and integrity" on the part of those serving in office (quoting *Withrow*, 421 U.S. at 47)).

---

[6] For this reason, Lemelson does not base his request for a preliminary injunction on his likelihood (in the district court) of succeeding on the merits of this claim.

[7] Notably, SEC makes no effort to defend the reasoning of *Blinder* or *Withrow* on the merits; its argument is based entirely on *stare decisis*.

Perhaps the high-water mark of that bygone era was *Withrow* itself, in which the Supreme Court improbably found no risk of partiality or unfairness where an administrative adjudicator had previously considered the evidence against the accused respondent in the context of a predicate decision to approve the filing of the charges that led to the adjudication.  421 U.S. at 56.  *Blinder* went even further by holding that due process is not offended even where the administrative adjudicator not only previously considered the evidence when approving the charges (*ex parte*, no less!) but also later became the named plaintiff in parallel adversarial court litigation against the same accused person, and even where that parallel adversarial court litigation was still ongoing at the time of the agency's administrative adjudication.  837 F.2d at 1104–06.

The *Blinder* decision was also heavily influenced by the panel's repeatedly expressed (and arguably hyperbolic) reluctance to upset the then-prevailing status quo in the field of administrative law.  *See, e.g., id.* at 1104 (petitioner's due process challenge "represents nothing less than an assault on the constitutionality of a principal feature of the Administrative Procedure Act itself"); *id.* at 1107 (petitioner's due process challenge "would bring down too many procedures designed, and working well [*sic*], for a governmental structure of great and growing complexity" (quoting *Withrow*, 421 U.S. at 49–50); *id.* at 1107 (petitioner's due process challenge would "work a revolution in administrative (not to mention constitutional) law" and "storm the barricades").  In more recent times, however, courts have dispensed with *Blinder*'s excessive reverence for conventional wisdom about administrative law and related reticence to reconsider conventional wisdom even when it contradicts emerging notions of due process and separation of powers.  Indeed, in recent years the Supreme Court has, by most accounts, effectively "work[ed] a revolution in administrative (if not constitutional law)" with rulings that have, for example,

prohibited agencies from imposing monetary penalties in their administrative adjudications,[8] rejected agency efforts to evade or enlarge their statutory deadlines for commencing enforcement proceedings;[9] curtailed agency power to seek restitution and disgorgement from alleged wrongdoers;[10] required agency adjudicators of enforcement cases and other important matters to be appointed by the President or by a presidentially appointed and Senate-confirmed "Head of Department;"[11] invalidated excessive statutory restrictions on the President's ability to remove agency officers who wield significant executive powers;[12] and, most important here, allowed agency enforcement targets to preemptively enlist federal district courts to scrutinize the structural constitutionality of agency in-house, non-jury administrative enforcement proceedings instead of forcing them to endure the entire administrative process before seeking judicial relief.[13]  Most of these rulings overturned the prevailing law in many judicial circuits, not to mention longstanding assumptions and conventional wisdom within federal agencies and among legal practitioners.

Lemelson respectfully submits that the decision in *Blinder* was not only profoundly mistaken at the time but, more importantly, would be decisively swept aside if and when it were assessed by today's Supreme Court.  Even assuming today's Court might conceivably reaffirm its own decision in *Withrow* (a dubious assumption), the Court's above-noted intervening precedents on administrative law, administrative deference, administrative adjudication, and due process have

---

[8] *SEC v. Jarkesy*, 603 U.S. 109 (2024).

[9] *Kokesh v. SEC*, 581 U.S. 455, 457, 461 (2017) (SEC cases seeking disgorgement); *Gabelli v. SEC*, 568 U.S. 442, 447-49 (2013) (SEC cases seeking civil monetary penalties).

[10] *AMG Capital Mgmt., LLC v. FTC*, 593 U.S. 67, 70, 75–78 (2021) (restitution); *Liu v. SEC*, 591 U.S. 71, 85-87 (2020) (disgorgement).

[11] *Lucia v. SEC*, 585 U.S. 237, 241, 244–49 (2018) (addressing SEC administrative law judges); *United States v. Arthrex*, 594 U.S. 1, 16–17 (2021) (addressing administrative patent judges assigned to the Patent Trial and Appeal Board).

[12] *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 495–98 (2010).

[13] *Axon/Cochran*, 598 U.S. at 180, 189, 195-96 (2023); *Free Enter. Fund*, 561 U.S. at 489–91 (2010).

fundamentally rejected the factual premises, presumptions, and legal analysis upon which *Blinder*'s relevant holdings were based. Moreover, the Court would likely find *Blinder* impossible to square with its own intervening decisions emphasizing the critical importance of both impartiality and the appearance of impartiality on the part of adjudicators. *See, e.g.*, *Williams v. Pennsylvania*, 579 U.S. 1, 4, 16 (2016) (appellant's due process rights violated by the participation of one of six state supreme court justices who, 30 years earlier as a district attorney, had given his "official approval" to subordinate prosecutors to seek the death penalty against the appellant, even though eventual supreme court decision was unanimous); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872, 884–86 (2009) (litigant's due process rights violated where one state supreme court justice in 3-2 majority decision against litigant had received campaign contributions from the chairman of litigant's corporate adversary). In both *Williams* and *Caperton*, the Court cited *Withrow* for the proposition that courts must ask whether "under a realistic appraisal of psychological tendencies and human weakness," an adjudicator's interest in the outcome of a case "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Williams*, 579 U.S. at 13; *id.* at 21 (Roberts, C.J., dissenting); *Caperton*, 556 U.S. at 883–84. And both cases interpreted the requirements of due process more expansively than *Withrow* or *Blinder*.

Lemelson respectfully submits that even if the Court considers itself bound by *Blinder* due to stare decisis, the Court should not dismiss Lemelson's due process claim at this early stage but rather should defer decision on the matter until the conclusion of the litigation, by which point the Supreme Court or the D.C. Circuit may have provided more recent guidance on the issue of whether an agency's dual and simultaneous role as both judge and adversarial litigant against the same person violates due process. And should the Court feel compelled to decide this issue now,

Lemelson respectfully submits that the Court's decision should acknowledge the grounds for difference of opinion on the continuing vitality of *Blinder* and encourage the D.C. Circuit to reconsider *Blinder* at its earliest opportunity.

### B.  Res Judicata (Claim 5)

SEC's bid to dismiss Lemelson's res judicata claim rests on the premise that SEC could not have asked the Massachusetts district court to impose, and that court would have lacked power to impose, the type of industry suspension or order SEC now threatens to impose in its follow-on administrative enforcement prosecution.  That's incorrect.  For decades, SEC and the courts have insisted that so long as a district court's equitable powers are put in play by SEC's request for injunctive relief, those equitable powers are broad and flexible.  For example, even before SEC was given any statutory power to bar or suspend wrongdoers from serving as officers or directors of publicly traded corporations, SEC frequently sought and obtained court injunctions that included such suspensions and bars as ancillary equitable relief.  *See, e.g., SEC v. Posner*, 16 F.3d 520, 521-22 (2d Cir. 1994); *see generally* Philip F.S. Berg, Note: *Unfit to Serve: Permanently Barring People from Serving as Officers and Directors of Publicly Traded Companies After the Sarbanes-Oxley Act*, 56 VANDERBILT L. REV. 1871, 1876-77 (2003).  In similar fashion, SEC is currently asking a federal court to bar or suspend an accountant from "appearing or practicing" before SEC, even though the only statutory basis for such relief appears to contemplate that SEC will typically impose such relief unilaterally through its administrative process rather than seeking it as part of an injunction in federal court.  *See SEC v. Dellomo*, No. 24-cv-1727, ECF No. 1, at 30 (SEC Complaint filed Oct. 29, 2024).

SEC falls back again on the D.C. Circuit's decision in the *Blinder* case.  SEC Br. at 36-37. As previously explained, *Blinder* was wrongly decided and is wholly irreconcilable with

subsequent Supreme Court decisions.  Moreover, to the extent the D.C. Circuit in *Blinder* briefly discussed the fact that SEC could have sought an industry bar or suspension as part of the predicate federal court injunction in that case, *see* 837 F.2d at 1107–08, the decision did not specifically address that issue under the specific rubric of res judicata, and thus it is not necessarily controlling.

Here, SEC's administrative prosecution plainly seeks a second bite at the same apple that was ripe and available to it in its federal court proceeding, where it had a full and fair opportunity to litigate through trial and post-trial motions.  SEC made no effort to secure an industry bar or suspension in that case, and thus its current effort to obtain the same relief in its own subsequent administrative proceeding comes too late and is barred by res judicata.

## CONCLUSION

The Court should immediately issue a preliminary injunction that pauses SEC's administrative prosecution against Lemelson at least until the Court has an opportunity to consider the merits of his claims challenging the constitutional and legal legitimacy of that prosecution. The Court should then in due course deny in its entirety SEC's separate motion to dismiss the Amended Complaint.

February 24, 2025                                    Respectfully submitted,

                                                    /s/ *Russell G. Ryan*
                                                    Russell G. Ryan (DDC Bar No. 414472)
                                                    John J. Vecchione (DDC Bar No. 431764)
                                                    Andreia Trifoi (DDC Bar App. Pending)
                                                    NEW CIVIL LIBERTIES ALLIANCE
                                                    4250 N. Fairfax Dr., Suite 300
                                                    Arlington, VA  22203
                                                    (202) 869-5210
                                                    russ.ryan@ncla.legal

                                                    *Counsel for Plaintiff Rev. Fr. Emmanuel Lemelson*

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the foregoing brief was filed on February 24, 2025 via this Court's electronic filing system and was thereby served on all counsel of record via the notification of docket activity generated by the filing.

/s/ Russell G. Ryan
Russell G. Ryan

*Counsel for Plaintiff*