## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REVEREND FATHER EMMANUEL
LEMELSON,

       *Plaintiff*,

    v.

SECURITIES AND EXCHANGE
COMMISSION,

       *Defendant*.

Civil Action No. 24-2415 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

The Reverend Father Emmanuel Lemelson was recently the subject of a Securities and Exchange Commission (SEC or Commission) civil enforcement action in federal court where a jury found him liable under antifraud provisions of the federal securities laws. Lemelson was ordered to pay a civil penalty and enjoined from violating certain federal securities laws for five years. Now the SEC has initiated an in-house administrative proceeding to suspend or bar Lemelson from working in the securities industry. Lemelson brought this lawsuit to challenge the SEC's follow-on proceeding on constitutional and res judicata grounds. Lemelson seeks preliminary injunctive relief, and the SEC has moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court is unpersuaded by Lemelson's arguments. It dismisses two of his claims under Rule 12(b)(1) for lack of jurisdiction and the rest under Rule 12(b)(6).

### BACKGROUND

#### A.    Statutory Background

"The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock

market crash of 1929 and the depression of the 1930[s]." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963). "Like the Securities Act of 1933 and the Securities Exchange Act of 1934, the Investment Advisers Act was intended to achieve a high standard of business ethics in the securities industry." *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) (cleaned up). The Advisers Act accordingly "establishes federal fiduciary standards to govern the conduct of investment advisers," *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (cleaned up), "imposing on them an affirmative duty of utmost good faith, and full and fair disclosure of all material facts," *Robare Grp., Ltd.*, 922 F.3d at 472 (cleaned up).

Section 203(f) of the Advisers Act "authorized the SEC to oversee the registration and licensing of different classes of participants in the securities markets[.]" *Bartko v. SEC*, 845 F.3d 1217, 1219 (D.C. Cir. 2017) (citations omitted). It also "authorized the [SEC] to suspend or bar a participant from specific classes if certain conditions were met." *Id.* (citations omitted). As presently codified, 15 U.S.C. § 80b-3(f) allows the SEC to suspend or bar someone if it finds "on the record after notice and opportunity for hearing" that (1) such a suspension or bar is "in the public interest," and (2) that the person "has been convicted" of certain crimes or has been "enjoined from any action, conduct, or practice" specified in another paragraph, *id.*, including being enjoined from "engaging in or continuing any conduct or practice . . . in connection with the purchase or sale of any security," *id.* § 80b-3(e)(4). These proceedings are called "follow-on administrative proceeding[s]." *Bartko*, 845 F.3d at 1219. And the Advisers Act allows "[a]ny person or party aggrieved by" an SEC order issued pursuant to such proceedings to "obtain a review of [the] order in the United States court of appeals within any circuit wherein such person resides or has his principal office or place of business, or in the United States Court of Appeals for the District of Columbia[.]" 15 U.S.C. § 80b-13(a).

### B.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiff's Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

The Reverend Father Emmanuel Lemelson "manages an investment fund called The Spruce Peak Fund, LP." First Am. Compl. (Am. Compl.) ¶ 3, ECF No. 10. About ten years ago, in 2015, the SEC "launched an . . . investigation against him . . . after a pharmaceutical company complained about Lemelson's . . . public criticism of the company the year before." *Id.* ¶ 8. "In September 2018, just months after Lemelson sent an open letter to Congress accusing [the] SEC of incompetence and financial illiteracy, the agency sued Lemelson in the United States District Court for the District of Massachusetts," alleging that he "had engaged in market manipulation and other nefarious misconduct." *Id.*

The SEC "overwhelmingly lost its case before the Massachusetts federal jury and obtained only a small fraction of the relief it demanded." *Id.* ¶ 11. But the district court still "entered a final judgment" that "summarily enjoined Lemelson 'from violating Section 10(b) of the [Securities] Exchange Act and [SEC] Rule 10b-5 for a period of five years' while ordering him to pay a $160,000 civil penalty and no disgorgement." *Id.* And the SEC has now initiated a follow-on administrative proceeding to suspend or bar Lemelson, citing the district court's injunction as the relevant predicate act. *Id.* ¶ 20. Lemelson spends much of his Amended Complaint cataloguing various details to show that the SEC is biased against him. *See id.* ¶¶ 6–10, 12–20. He summarizes the central problem as follows: The "SEC has not only an intense and obvious prejudice against [him] but also the undeniable appearance of bias *in favor of* its own lawyers, who are now appearing before [the] SEC" and one of its Administrative Law Judges (ALJs) "as lead prosecutors

of the administrative follow-on proceeding after having advised [the] SEC, *ex parte*, in connection

with the parallel Massachusetts federal court litigation against Lemelson." *Id.* ¶ 21.

### C. Procedural Background

Lemelson filed his Amended Complaint on December 17, 2024, bringing five claims

against the Commission. *See id.* ¶¶ 30–47. He alleges (1) that the SEC denied him due process,

(2) that the SEC usurped judicial power in violation of Article III, (3) that the SEC has

unconstitutionally deprived him of a jury trial, (4) that the SEC ALJ's multiple layers of removal

protections violate Article II, and (5) that res judicata bars the follow-on administrative

proceeding. *See id.* Lemelson moved for a preliminary injunction on the same day. *See* Pl.'s Mot.

Prelim. Inj., ECF No. 11. And on January 16, 2025, the SEC moved to dismiss the case. *See* Mot.

Dismiss, ECF No. 13; *see also* Def.'s Opp'n Mot. Prelim. Inj., ECF No. 14. These motions are

fully briefed and are ripe for review. *See* Pl.'s Opp'n Mot. Dismiss (Pl.'s Opp'n), ECF No. 18;

Pl.'s Reply Supp. Mot. Prelim. Inj., ECF No. 17; Def.'s Reply Supp. Mot. Dismiss (Def.'s Reply),

ECF No. 21.

## LEGAL STANDARDS

"A motion under Rule 12(b)(1) presents a threshold challenge to a court's jurisdiction."

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022)

(cleaned up). The plaintiff "bears the burden of providing by a preponderance of the evidence that

the Court has subject-matter jurisdiction over her claims." *Schmidt v. U.S. Capitol Police Bd.*,

826 F. Supp. 2d 59, 69 (D.D.C. 2011). When evaluating a motion under Rule 12(b)(1), "the court

may consider documents outside the pleadings to assure itself that it has jurisdiction." *Sandoval v.*

*U.S. Dep't of Justice*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a

complaint has properly stated a claim upon which relief may be granted." *Kursar v. Transp. Sec.*

*Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010) (citation omitted). When deciding a Rule 12(b)(6) motion, the court must "treat the complaint's factual allegations as true" and "must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up). But the Court need not accept the plaintiff's "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). And the court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (cleaned up).

## DISCUSSION

The Commission moves to dismiss two of Lemelson's claims under Rule 12(b)(1) for lack of subject matter jurisdiction. *See* Def.'s Mot. Dismiss at 9–14. And it moves to dismiss the remaining three claims under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. *See id.* at 14–37. The Court is persuaded by the Defendant's arguments and dismisses all five of Lemelson's claims.

### A.    Subject Matter Jurisdiction

The Commission argues that the Court lacks subject matter jurisdiction over Lemelson's third and fifth claims. *Id.* at 9–14. More specifically, it argues that Congress has "preclude[d] district courts from exercising jurisdiction over [these] challenges to federal agency action" by specifying in the Advisers Act "a different method to resolve" these claims. *Id.* at 9 (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023)). The Court agrees and dismisses the third and fifth claims under Rule 12(b)(1).

District courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. But Congress may "preclude district

courts from exercising jurisdiction over challenges to federal agency action" by "substitut[ing] for that district court authority an alternative scheme of review." *Axon*, 598 U.S. at 185. Congress may do so explicitly by "providing in so many words that district court jurisdiction will yield." *Id.* But it may also do so implicitly by "'specifying a different method to resolve claims about agency action,' typically by providing for 'review in a court of appeals following the agency's own review process.'" *Vape Cent. Grp., LLC v. U.S. Food & Drug Admin.*, No. 24-cv-3354, 2025 WL 637416, at *4 (D.D.C. Feb. 27, 2025) (quoting *Axon*, 598 U.S. at 185). Here, Congress took the latter path with the Advisers Act, providing that "a party aggrieved by an order issued by the Commission under this subchapter may obtain a review of such order in the [appropriate] United States court of appeals." 15 U.S.C. § 80b-13(a); *see also N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1132 (D.C. Cir. 2015) (holding "the courts of appeals" have "exclusive jurisdiction" under 15 U.S.C. § 80b-13(a)).

"But a statutory review scheme of that kind does not necessarily extend to every claim concerning agency action." *Axon*, 598 U.S. at 185. It extends only to claims "of the type Congress intended to be reviewed within [the] statutory structure." *Id.* at 186 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 208 (1994)). "Three considerations, referred to as the *Thunder Basin* factors, help courts determine whether a claim is subject to the presumptive 'statutory structure' for direct appellate review or whether it falls outside this scheme." *Vape Cent. Grp.*, 2025 WL 637416, at *4. First, courts ask whether "precluding district court jurisdiction" could "'foreclose all meaningful judicial review' of the claim." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13). Second, courts ask whether the claim is "wholly collateral to [the] statute's review provisions." *Id.* (quoting *Thunder Basin*, 510 U.S. at 212). And third, courts ask whether the claim is "outside the agency's expertise." *Id.* (quoting *Thunder Basin*, 510 U.S. at

212). "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.'" *Id.* (quoting *Free Enter. Fund v. Pub. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)). "But the same conclusion might follow if the factors point in different directions." *Id.* "When that happens, courts must return to the lodestar of whether Congress intended the claim at issue to be swept into the statutory enforcement scheme." *Vape Cent. Grp.*, 2025 WL 637416, at *5. Applying these factors, the Court concludes that Lemelson's third and fifth claims are "of the type Congress intended to be reviewed within [the] statutory structure." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212).

### 1.    Denial of Jury Trial (Claim 3)

Lemelson alleges that the "SEC seeks to deprive him of his private liberty and private property rights to pursue his chosen profession and his chosen means of livelihood" without a jury trial in contravention of *SEC v. Jarkesy*, 603 U.S. 109 (2024), Am. Compl. ¶ 39, which held that the Seventh Amendment guarantees a jury trial in certain circumstances, *see Jarkesy*, 603 U.S. at 140–41. But this claim is precluded by the Advisers Act under the *Thunder Basin* factors.

*First*, preclusion would not "foreclose all meaningful judicial review of the claim." *Axon*, 598 U.S. at 186 (cleaned up). The Supreme Court has explained that "adequate judicial review does not usually demand a district court's involvement" because "[r]eview of agency action in a court of appeals can alone 'meaningfully address[]' a party's claims." *Id.* at 190 (quoting *Thunder Basin*, 510 U.S. at 215) (citing *Elgin v. Dep't of Treasury*, 567 U.S. 1, 21 (2012) (holding Federal Circuit review over constitutional claims was "meaningful review"). And here, 15 U.S.C. § 80b-13(a) provides such review by allowing a "party aggrieved by an order issued by the Commission under this subchapter" to "obtain a review of such order in the [appropriate] United States court of appeals." *Id.* Lemelson can therefore obtain meaningful review of the

Commission's decision, including any Seventh Amendment defense, in an Article III court. If a court of appeals agrees with Lemelson's Seventh Amendment argument, he can ask that court to vacate the Commission's decision. *See, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 465–66 (5th Cir. 2022).

*Free Enterprise Fund* does not foreclose this conclusion. There, the Supreme Court held that 15 U.S.C. § 78y did not preclude district court jurisdiction. *See* 561 U.S. at 491. Much like the statutory provision at issue here, that Section provided that "[a] person aggrieved by a final order of the Commission . . . [could] obtain review of the order in the [appropriate] United States Court of Appeals[.]" 15 U.S.C. § 78y(a)(1). The problem in that case, however, was that the plaintiff had challenged actions of the Public Company Accounting Oversight Board, "and not every Board action [was] encapsulated in a final Commission order or rule." *Free Enter. Fund*, 561 U.S. at 490. This meant that the statutory scheme—which "provide[d] only for judicial review of *Commission* action"—might never have provided the plaintiff with judicial recourse. *Axon*, 598 U.S. at 190 (quoting *Free Enter. Fund*, 561 U.S. at 490). That concern does not apply here. Lemelson challenges SEC actions, and 15 U.S.C. § 80b-13(a) allows for review of orders "issued by the Commission." *Id.*

Lemelson reads *Free Enterprise Fund* more broadly. He argues that he is similarly situated to the plaintiff in that case because, as of now, "there is no final SEC order from which Lemelson [may] seek review," and "there may never be one." Pl.'s Opp'n at 8. According to him, this makes "the possibility of future judicial review of any final SEC order . . . entirely hypothetical and speculative at this point, just as it was in *Free Enterprise Fund*." *Id.* But this reading cannot be squared with *Axon*. There, one of the plaintiffs sued the SEC in federal district court *after* it had brought an enforcement action but *before* the ALJ hearing had begun. *See Axon*, 598 U.S. at 182.

And the Supreme Court did not think that *Free Enterprise Fund* controlled. *See id.* at 191. It explained that because the plaintiffs were "parties in ongoing SEC and FTC proceedings, and the statutes at issue provide[d] for judicial review of SEC and FTC action," the plaintiffs could "(eventually) obtain review of their constitutional claims through an appeal from an adverse agency action to a court of appeals." *Id.* at 190–91. *Free Enterprise Fund* thus does not support Lemelson's claim that judicial review is too speculative here. *Cf. Vape Cent. Grp.*, 2025 WL 637416, at *5 ("In general, review of agency decisions must await finality; that is, in at least most circumstances, a regulated party has no right to obtain judicial review of the relevant rules and procedures until after the agency has rendered a decision.").

*Axon* ultimately held that preclusion would foreclose meaningful judicial review, but not in a way that bears on this case. *See* 598 U.S. at 196. Dealing with the same provision from *Free Enterprise Fund*, the Court "recognized a narrow exception to Congress's prescribed path for judicial review of agency action for facial challenges to the constitutional structure of administrative agencies' ability to operate." *Loma Linda-Inland Consortium for Healthcare Educ. v. NLRB*, No. 23-5096, 2023 WL 7294839, at *11 (D.C. Cir. Feb. 27, 2025). The *Axon* plaintiffs alleged that they were "being subjected" to a "proceeding by an unaccountable ALJ." *Axon*, 598 U.S. at 191. This was a structural claim that had nothing to do with the result of the administrative proceeding before the agency. *See id.* To the contrary, each plaintiff "would have [had] the same claim had it *won* before the agency." *Id.* The Court therefore concluded that the plaintiffs had alleged a "here-in-now injury" about which "the court of appeals [could] do nothing." *Id.*

But Lemelson's third claim does not fit within this "narrow exception." *Loma*, 2023 WL 7294839, at *11. That is because the alleged harm caused by the denial of a jury trial

does not "arise merely from his appearance in [SEC] proceedings." *Blankenship v. Fin. Indus. Regul. Auth.*, No. 24-cv-3003, 2024 WL 4043442, at *2 (E.D. Pa. Sept. 4, 2024). Rather, the harm accrues only if the SEC takes "certain allegedly unconstitutional steps to injure him." *Id.*; *see also Vape Cent. Grp.*, 2025 WL 637416, at *7 ("Thus, Vape Central's Seventh Amendment claim is best characterized, not as a challenge to an 'unconstitutional proceeding,' but as a challenge to the ALJ's authority—if necessary—to resolve any disputed issues of fact."). And "[i]t is well-established that the harm resulting from the denial of a jury trial can be remedied on appeal, even after the case has already been tried—the reviewing court simply orders a new trial." *Ponte v. FDIC*, No. 24-cv-2379, 2024 WL 4730602, at *8 (D.D.C. Oct. 11, 2024) (collecting cases). So the Court joins the chorus of post-*Jarkesy* district court opinions holding that "the relevant statutory procedures for challenging final administrative orders provide a sufficient opportunity for 'meaningful review' of any Seventh Amendment defense." *Vape Cent. Grp.*, 2025 WL 637416, at *6 (citing *VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 24-cv-2577, 2024 WL 4817175, at *3 (D.D.C. Nov. 17, 2024); *Blankenship*, 2024 WL 4043442, at *2 n.4; *Nexstar Media, Inc. Grp. v. NLRB*, No. 24-cv-1415, 2024 WL 4127090, at *5 (N.D. Ohio Aug. 26, 2024)).

*Second*, the claim is not "wholly collateral to [the] statute's review provision." *Axon*, 598 U.S. at 186 (cleaned up). The Court in *Axon* held that the structural constitutional claims were collateral because the plaintiffs were "challenging the Commissions' power to proceed at all, rather than actions taken in the agency proceedings." *Id.* at 192. Put another way, the plaintiffs "object[ed] to the Commission's power generally, not to anything particular about how that power was wielded." *Id.* at 193. But the same cannot be said for Lemelson. His third claim challenges the lack of "any procedural option for a trial by jury," Am. Compl. ¶ 40, not the existence of the SEC. "[T]his is not a case in which the asserted injury exists separate and apart from the specifics of the

adjudicatory process[.]" *Vape Cent. Grp.*, 2025 WL 637416, at *8. Lemelson's claim is therefore not wholly collateral. *See, e.g.*, *Blankenship*, 2024 WL 4043442, at *2 (holding Seventh Amendment claims were "not wholly collateral because they d[id] not challenge FINRA's existence" (citation omitted)).

*Third*, the claim is not "outside the agency's expertise." *Axon*, 598 U.S. at 186. The Court acknowledges that this is a closer question because it may seem like the contours of the Seventh Amendment belong "squarely within the judicial ken." *Vape Cent. Grp.*, 2025 WL 637416, at *8. "But framing the application of the third *Thunder Basin* factor in that limited manner risks creating a far more expansive exception to the statutory review procedures than the Supreme Court has ever embraced; most, if not all, questions of constitutional law fall outside of the expertise of the administrative agencies." *Id.* "Instead, this factor is better understood to ask whether the challenge raises a pure question of constitutional law, detached from considerations of agency policy, or whether it raises a mixed question of law and fact (or policy), where agency action might shed light on the constitutional question or obviate the need for judicial review." *Id.* (cleaned up).

Lemelson's *Jarkesy* claim is intertwined with the development of the factual record. This is because "the right to a jury trial arises only if 'there are issues of fact to be determined.'" *Vape Cent. Grp.*, 2025 WL 637416, at *7 (quoting *In re Peterson*, 253 U.S. 300, 310 (1920)). So "[u]nlike in *Axon*," "development of the factual record before the administrative agency provides an essential component" of a Seventh Amendment claim. *Id.* at *9. This means that "the agency's expertise regarding the factual dispute, if any, may play a central role in the court of appeals' ultimate resolution of the constitutional argument." *Id.* It should therefore come as no surprise that the SEC and its ALJs have experience applying the Seventh Amendment in its enforcement proceedings. *See, e.g.*, *In re Application of Kabani & Co.*, 116 SEC Docket 1095,

2017 WL 947229, at *20 (Mar. 10, 2017) ("The Supreme Court has similarly held that the Seventh Amendment is not applicable to administrative proceedings." (cleaned up)); *John Thomas Cap. Mgmt. Grp.*, Initial Decision Release No. 693, 2014 WL 5304908, at *6 (ALJ Oct. 17, 2014) (holding respondents' argument that "not having an opportunity of a hearing before a jury violates the Seventh Amendment . . . has no merit"). The D.C. Circuit has even cited one of those agency opinions to conclude that the SEC "has proven fully capable of considering [an individual's] attacks on the fairness of his proceeding." *Jarkesy v. SEC*, 803 F.3d 9, 28 (D.C. Cir. 2015). The Court accordingly finds that the SEC's expertise may be "brought to bear" in this case. *Elgin*, 567 U.S. at 23.

The Court caps this *Thunder Basin* analysis by returning to the "lodestar" of congressional intent. *Vape Cent. Grp.*, 2025 WL 637416, at *5. The Advisers Act created a statutory scheme for follow-on proceedings that relies on decision-making by the SEC. It is hard to imagine that Congress wanted the subjects of those proceedings to be able to short-circuit that scheme by running straight to district court to challenge that congressional decision. Of course, there are certain types of claims where appellate review would come too late to be of any use. *See Axon*, 598 U.S. at 191. And we presume that Congress meant not to foreclose such claims. *Cf. id.* at 191 ("Judicial review of . . . structural constitutional claims would come too late to be meaningful."). But those claims make up only a "narrow exception." *Vape Cent. Grp.*, 2025 WL 637416, at *6–8 (quoting *Loma*, 2023 WL 7294839, at *11). And that exception is not implicated here because any harm caused by the denial of a jury trial "can be remedied on appeal," *Ponte*, 2024 WL 4730602, at *8 (collecting cases).

Lemelson raises one final point in opposition. He argues that even if the statutory scheme precludes district court jurisdiction over this claim, the Court retains supplemental jurisdiction

under 28 U.S.C. § 1367 because the claim arises from the same nucleus of operative facts as his remaining claims. *See* Pl.'s Opp'n at 11. But he cites no authority for this theory. *See id.* at 11–12. And the case law suggests there is no such work-around to preclusion. *See Elgin*, 567 U.S. at 5 (holding a claims-channeling statute "provides the exclusive avenue to judicial review"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 395 (D.D.C. 2018) (Jackson, J.) (explaining that although Congress has provided federal district courts with "federal question jurisdiction," "diversity jurisdiction," and "supplemental jurisdiction," it "may also choose to *withhold* jurisdiction[] by 'channeling' certain types of claims through alternative review mechanisms" (citing *Elgin*, 567 U.S. at 9; *Thunder Basin*, 510 U.S. at 207)), *rev'd on other grounds*, 929 F.3d 748 (D.C. Cir. 2019). The Court therefore declines to create such a carve-out.

### 2.    Res Judicata (Claim 5)

Lemelson alleges that in the prior federal court proceedings, the "SEC could have requested that the injunction include a bar or suspension to restrict [him] from participating in the securities industry." Am. Compl. ¶ 45. But because the SEC declined to do so, he argues that "well-established principles of *res judicata* forbid [the] SEC from splitting its claims and pursuing a second prosecution against Lemelson to obtain that relief now[.]" *Id.* ¶ 46. But for many of the same reasons as described above, *see supra*, at 7–13, this claim is precluded by the Advisers Act under the *Thunder Basin* factors.

First, preclusion would not "foreclose all meaningful judicial review of the claim." *Axon*, 598 U.S. at 186 (cleaned up). Lemelson is a "part[y] in ongoing SEC . . . proceedings, and the statute[] at issue provide[s] for judicial review of SEC . . . action." *Id.* at 190 (citation omitted); *see also* 15 U.S.C. § 80b-13(a). "So *Free Enterprise Fund*'s analysis of the judicial review factor does not control." *Axon*, 598 U.S. at 191. And this res judicata claim does not fit within *Axon*'s

"narrow exception to Congress's prescribed path for judicial review of agency action for facial challenges to the constitutional structure of administrative agencies' ability to operate." *Loma*, 2024 WL 7294839, at *11 (citation omitted). Second, the claim is not "wholly collateral," *Axon*, 598 U.S. at 186, because Lemelson is challenging something "particular about how [the SEC's] power was wielded" instead of "object[ing] to the Commission's power generally," *id.* at 193. And third, the claim is not "outside the agency's expertise," *id.* at 186, or "detached from 'considerations of agency policy,'" *id.* at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). Resolution of the res judicata question necessarily involves consideration of the nature of the prior federal civil enforcement action and the follow-on administrative proceeding, both brought under federal securities laws. *See Beavers v. Watters*, No. 10-cv-1343, 2010 WL 3155179, at *1 (D.D.C. Aug. 10, 2010) ("Under the principle of *res judicata*, a final judgment on the merits in one action bars any further claim based on the same nucleus of facts." (cleaned up)). It is therefore intertwined with the question before the Commission. More generally, the Court is convinced that Congress intended for challenges like these to proceed though the prescribed statutory scheme. *Cf. supra*, at 12; *see also* Axon, 598 U.S. at 186 ("The ultimate question is how best to understand what Congress has done[.]").

## B.    Failure to State a Claim

The Commission argues that the remaining claims should be dismissed for failure to state a claim upon which relief may be granted. *See* Def.'s Mot. Dismiss at 14. The Court agrees and dismisses Lemelson's first, second, and fourth claims under Rule 12(b)(6).

### 1.    Due Process (Claim 1)

Lemelson alleges that the SEC's follow-on procedures violate due process by allowing adjudicators to "decide their own cases." Am. Compl. ¶ 33 (citing *Williams v. Pennsylvania*, 579

U.S. 1, 8–9 (2016); *In re Murchison*, 349 U.S. 133, 136–37 (1955)). But the D.C. Circuit has already rejected this argument. *See Blinder, Robinson & Co. v. SEC*, 837 F.2d 1099, 1104 (D.C. Cir. 1988). And neither the Supreme Court nor the D.C. Circuit has expressly or impliedly overruled that case. So the Court dismisses this claim.

In *Blinder*, the SEC brought a civil enforcement action against the petitioners in federal court alleging "violations of the antifraud provisions of both the Securities Act of 1933 and the Securities Exchange Act of 1934." 837 F.2d at 1101. After a full trial, the district court found the petitioners had violated those antifraud provisions. *See id.* As that litigation "was proceeding through the appellate process, the SEC instituted an *administrative* proceeding" against one of the petitioners and its president "pursuant to [S]ection 15(b)(4) of the 1934 Act." *Id.* (citing 15 U.S.C. § 78o(b)(4)). Much like the provision at issue here, that Section "authorize[d] the Commission to impose sanctions on broker-dealers if, after notice and hearing, it determine[d] that sanctions [were] in 'the public interest.'" *Id.* The petitioner who was subject to these follow-on proceedings challenged them on due process grounds: "Having prevailed on its contested lawsuit, the SEC now is seeking to exercise quasi-judicial discretion to decide how severely [the petitioner] should be sanctioned for the conduct that was the subject of the lawsuit." *Id.* at 1104 (cleaned up). It thought that such a procedure would allow the SEC to "become a judge of its own claim." *Id.* (cleaned up). But the D.C. Circuit rejected this argument, relying in large part on *Withrow v. Larkin*, 421 U.S. 35 (1975), to hold that the procedure was "not founded upon a violation of the Due Process Clause." *Blinder*, 837 F.2d at 1107. Lemelson's claim cannot be meaningfully distinguished from the one advanced in *Blinder* and therefore fails as a matter of law.

Lemelson concedes that his due process claim is in "tension" with *Blinder*. Am. Compl. ¶ 34 n.1; *see also* Pl.'s Opp'n at 20. But rather than resolving that tension, he argues that "*Blinder*

was not only profoundly mistaken at the time but, more importantly, would be decisively swept aside if and when it were assessed by today's Supreme Court." Pl.'s Opp'n at 22. This misstates the standard for vertical stare decisis. "[D]istrict judges . . . are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) (citation omitted). Controlling precedent may also be "effectively overruled," but only if an intervening Supreme Court decision "'eviscerates' the prior precedent such that the two cases are 'incompatible.'" *Harriott v. WMATA*, No. 19-cv-1656, 2019 WL 7066631, at *1 (D.D.C. Dec. 23, 2019) (quoting *Perry v. MSPB*, 829 F.3d 760, 764 (D.C. Cir. 2016), *vacated on other grounds sub nom. Perry v. Ross*, 697 F. App'x 18 (D.C. Cir. 2017)).

Lemelson points to no case that "eviscerates" *Blinder*'s reasoning. *See* Pl.'s Opp'n at 21–24. Far from it. Most of the cases he cites deal with unrelated issues like the Seventh Amendment right to a jury trial, *see Jarkesy*, 603 U.S. at 140–41, the application of a statute of limitations to SEC proceedings, *see Kokesh v. SEC*, 581 U.S. 455, 457, 461 (2017); *Gabelli v. SEC*, 568 U.S. 442, 447–49 (2013), the outer bounds of an agency's statutory authority to seek equitable remedies, *see AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 70, 75–78 (2021); *Liu v. SEC*, 591 U.S. 71, 85–87 (2020), the Appointments Clause, *see Lucia v. SEC*, 585 U.S. 237, 241, 244–49 (2018); *United States v. Arthrex*, 594 U.S. 1, 16–17 (2021), the President's removal powers, *see Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020); *Free Enter. Fund*, 561 U.S. at 495–98, and the statutory preclusion of federal district court jurisdiction, *see Axon*, 598 U.S. at 180; *Free Enter. Fund*, 561 U.S. at 489–91. And the few combination-of-function due process cases he does cite, *see* Pl.'s Opp'n at 23 (citing *Williams*, 579 U.S. at 4, 16; *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872, 884–86 (2009)); *see also* Am. Compl. ¶¶ 33, 34 n.1

(citing *Williams*, 579 U.S. at 8–9; *In re Murchison*, 349 U.S. at 136–37), are compatible with *Blinder* because they involved the judiciary instead of agency action, and *Blinder* itself noted that the Supreme Court had "expressly distinguished the situation of administrative agencies from the prototypical situation of a judge performing combined functions," 837 F.2d at 1105 (citing *Withrow*, 421 U.S. at 53).

Lemelson seems to argue that taking each case one at a time misses the forest for the trees. *See* Pl.'s Opp'n at 21–22. As he sees it, *Blinder* "was heavily influenced by the panel's repeatedly expressed . . . reluctance to upset the then-prevailing status quo in the field of administrative law." *Id.* at 21 (collecting quotations). And he cites many of the above cases to support the proposition that today's Supreme Court has shown no such reticence. *See id.* at 21–22 (collecting cases). But this is far too attenuated to effectively overrule *Blinder*. *See United States v. Richardson*, No. 23-cv-200, 2024 WL 402948, at *4 (D.D.C. Feb. 2, 2024) (saying "tension" between two cases "is not enough for this Court to disregard a prior factually indistinguishable decision" (cleaned up)); *cf., e.g.*, *Rai Care Ctrs. of Maryland I, LLC v. U.S. Off. of Personnel Mngmt.*, No. 18-cv-3151, 2024 WL 3694433, at *13 (D.D.C. Aug. 7, 2024) (holding *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), did not effectively overrule a D.C. Circuit precedent requiring deference to agency interpretations of ambiguous contracts).

Moreover, the Court reads *Blinder* as a straightforward application of *Withrow*. *See Blinder*, 837 F.2d at 1105 ("The permissibility of the APA-sanctioned regime under the Constitution has been strongly suggested (if indeed not settled) by the Supreme Court in the case of *Withrow v. Larkin*[.]"); *id.* at 1106 ("*Withrow v. Larkin* thus stands as a formidable (if not insurmountable) barrier to Mr. Blinder's due process attack."). And the D.C. Circuit has not stopped applying *Withrow* just because the Supreme Court has shown an appetite for change in

other doctrinal fields. *See Meta Platforms, Inc. v. FTC*, No. 24-cv-5054, 2024 WL 1549732, at *1 (D.C. Cir. Mar. 29, 2024) ("But under longstanding precedent, it is settled that an agency generally can constitutionally undertake both investigative and adjudicative functions." (citing *Withrow*, 421 U.S. at 55–58) (citation omitted))). This Court will not be the first to announce such a change.

### 2.    Article III (Claim 2)

Lemelson also alleges that the "SEC is usurping the judicial power of the United States and purporting to relocate and vest it in an independent agency of the executive branch, thereby violating Article III of the constitution and the constitutional separation of powers." Am. Compl. ¶ 37. "When determining whether a proceeding involves an exercise of Article III judicial power, [the Supreme Court's] precedents have distinguished between 'public rights' and 'private rights.'" *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (cleaned up). "Those precedents have given Congress significant latitude to assign adjudication of public rights to entities other than Article III courts." *Id.* (cleaned up). Lemelson challenges a follow-on proceeding that deals with a public right, so the Court dismisses this claim.

The Supreme Court "has not definitively explained the distinction between public and private rights." *Jarkesy*, 603 U.S. at 131 (cleaned up). Historically, "public rights were not rights important to the public, or rights created by the public, but rights *of the public*—that is, rights pertaining to claims brought by or against the United States." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 68 (1989) (Scalia, J., concurring); *see also Crowell v. Benson*, 285 U.S. 22, 50 (1932) ("As to determinations of fact, the distinction is at once apparent between cases of private right and those which arise between the government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments."). But over time, the Court developed a more capacious understanding of public rights, upholding

non-Article III adjudications even for disputes between private parties. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 593–94 (1985); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 835–36, 847–50 (1986). What never changed, however, was the idea that "the doctrine's heartland consist[ed] of claims belonging to the Government." *Jarkesy*, 603 U.S. at 174 (Sotomayor, J., dissenting).

The Supreme Court addressed the constitutionality of agency adjudications for statutory claims brought by the Government in *Atlas Roofing Company, Inc. v. Occupational Safety and Health Review Commission*, 430 U.S. 442 (1977). There, a congressional investigation had concluded that "work-related deaths and injuries had become a 'drastic' national problem." *Id.* at 444. "Finding the existing state statutory remedies as well as state common-law actions for negligence and wrongful death to be inadequate to protect the employee population from death and injury due to unsafe working conditions, Congress enacted the Occupational Safety and Health Act of 1970[.]" *Id.* at 444–45. That statute "created a new statutory duty to avoid maintaining unsafe or unhealthy working conditions" and empowered the Secretary of Labor to promulgate standards. *Id.* at 445. It also allowed the Government to impose civil penalties upon violators by proceeding before an administrative agency. *Id.* The Court upheld the structure as a case "in which the Government sue[d] in its sovereign capacity to enforce public rights created by statutes[.]" *Id.* at 450.

The Supreme Court revisited *Atlas Roofing* last term in *Jarkesy*. That case dealt with three statutes that were "designed to combat securities fraud and [to] increase market transparency," including the Advisers Act. *Jarkesy*, 603 U.S. at 115. The antifraud provisions of those statutes prohibited regulated individuals from engaging in fraudulent conduct. *See id.* at 116. And the SEC could enforce those provisions by adjudicating the matter itself. *Id.* The Court distinguished *Atlas*

*Roofing* to hold that the public rights doctrine did not apply. *See id.* at 136–41. As it saw it, "*Atlas Roofing* concluded that Congress could assign the OSH Act adjudications to an agency because the claims were 'unknown to the common law.'" *Id.* at 138 (quoting *Atlas Roofing*, 430 U.S. at 461). Meanwhile, the respondents before the Court "were prosecuted for 'fraudulent conduct,' . . . and the pertinent statutory provisions derive[d] from, and [were] interpreted in light of, their common law counterparts." *Id.* (cleaned up). This mattered because "[i]f a suit is in the nature of an action at common law, then the matter presumptively concerns *private* rights, and adjudication by an Article III court is mandatory." *Id.* at 128 (emphasis added) (citing *Stern v. Marshall*, 564 U.S. 462, 484 (2011)). *Atlas Roofing* therefore did not control. *Id.* at 136.

But *Atlas Roofing* applies where, as here, the agency brings claims "unknown to the common law." *Jarkesy*, 603 U.S. at 137 (cleaned up). In this case, an Article III court already adjudicated the SEC's antifraud enforcement action against Lemelson. *See* Def.'s Mot. Dismiss at 22; *see also* Am. Compl. ¶ 8. The only question left for the SEC ALJ to answer is whether barring or suspending Lemelson would be "in the public interest." 15 U.S.C. § 80b-3(f). The Commission has argued that this question "is not a common law cause of action 'borrow[ed]' by Congress for the Advisers Act, but is instead 'self-consciously novel.'" Def.'s Mot. Dismiss at 23 (quoting *Jarkesy*, 603 U.S. at 136–37). And Lemelson has not responded to this argument, conceding the point. *See* Pl.'s Opp'n; *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). That is determinative for this case. And zooming out, it is hard to see how allowing an agency to

answer such a policy-laden question would "chip away at the authority of the Judicial Branch." *Stern*, 564 U.S. at 503.

Lemelson seems to suggest that *Atlas Roofing* is not good law. *See* Pl.'s Opp'n at 14. He highlights language from *Jarkesy* stating that *Atlas Roofing* represents "a departure from our legal traditions" and that it has been ignored and criticized by commentators. *Id.* (quoting *Jarkesy*, 603 U.S. at 138 n.4). But the Court in *Jarkesy* was careful to note that it "express[ed] no opinion on these various criticisms." 603 U.S. at 138 n.4. *Atlas Roofing* therefore still controls this case. *See Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 71 (D.D.C. Mar. 14, 2024) ("To give existing precedent anything less than its full due based on speculation about what the Supreme Court might someday hold would exceed the authority of this Court, would inject grave uncertainty in the legal landscape, and would undermine the rule of law.").

Lemelson also argues more broadly that *Jarkesy* "effectively emasculated the public rights exception without expressly overruling it." Pl.'s Opp'n at 14. According to him, *Jarkesy* "strictly limited" the public rights doctrine "to cases involving revenue collection, foreign commerce, immigration, tariffs, relations with Indian tribes, and the granting of public benefits." *Id.* at 14–15 (citing *Jarkesy*, 603 U.S. at 128–30). But *Jarkesy* was not so ambitious. Right after listing those "historic categories of adjudications" that "fall within the exception," *Jarkesy*, 603 U.S. at 130, the Court clarified that it did not claim to "definitively explain[]" the public rights doctrine, *id.* at 131. The Court will take *Jarkesy* on its own terms.

The Court would come to the same conclusion even without *Atlas Roofing*. The Supreme Court reiterated in *Jarkesy* that cases concerning public rights are those that "historically could have been determined exclusively by the executive and legislative branches." 603 U.S. at 128 (cleaned up); *see also Stern*, 564 U.S. at 485 ("[The plurality in *Northern Pipeline*] concluded that

this 'public rights' exception extended only to matters arising between individuals and the Government in connection with the performance of the constitutional functions of the executive or legislative departments . . . that historically could have been determined exclusively by those branches." (cleaned up)). While it never clarified the historical pedigree required to qualify as a public right, we can glean some clues from the Court's citations.

On one end of the spectrum, it cited *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1856), which "took pains to justify the application of the exception . . . by explaining that it flowed from centuries-old rules concerning revenue collection by a sovereign." *Jarkesy*, 603 U.S. at 131 (citing *Murray's Lessee*, 59 U.S. (18 How.) at 281–85). But at the other end of the spectrum, it cited *Ex parte Bakelite Corp.*, 279 U.S. 438 (1929), and *United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011). *Ex parte Bakelite Corp.* was an opinion from 1929 that "upheld a law authorizing the President to impose tariffs on goods imported by unfair methods of competition" because "the political branches had traditionally held exclusive power over this field and had exercised it." *Jarkesy*, 603 U.S. at 130 (cleaned up). The Court there supported this historical claim by citing to *Cary v. Curtis*, 44 U.S. (3 How.) 236 (1845), *see Ex parte Bakelite Corp.*, 279 U.S. at 458 n.26, which involved an 1839 statute that "made the head of the Treasury Department the tribunal for the examination of claims for duties said to have been improperly paid," *Cary*, 44 U.S. (3 How.) at 239, 242. This suggests that the public rights doctrine might apply to adjudications that have been entrusted to non-Article III decisionmakers for a little under a century. And one need only look to *Jicarilla* to confirm this reading—a 2011 opinion recognizing "relations with Indian tribes" as a "historic categor[y]" of adjudication falling "within the [public rights] exception." *Jarkesy*, 603 U.S. at 130 (cleaned up). There, the Court used a string cite to support the proposition that Congress has plenary power over

"the organization and management" of the Indian trust relationship. *Jicarilla*, 564 U.S. at 175. And the oldest case cited was a little more than a century old at the time. *See id.* (citing *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 308 (1902)). So it appears that about a century of history is sufficient.

Congress enacted the Advisers Act nearly a century ago. *See* Investment Advisers Act of 1940, Pub. L. No. 76-686, 54 Stat. 789, 851. And the original statute included a provision that was materially similar to 15 U.S.C. § 80b-3(f). *See id.* § 203(d) ("The Commission after hearing may by order deny registration to or revoke or suspend the registration of an applicant under this section, if the Commission finds that such denial, revocation, or suspension is in the public interest and that such investment adviser . . . is permanently or temporarily enjoined by order, judgment, or decree of any court of competent jurisdiction . . . from engaging in or continuing any conduct or practice . . . in connection with the purchase or sale of any security[.]"). This separates 15 U.S.C. § 80b-3(f) from the provision at issue in *Jarkesy*, which was "barely over a decade old." 603 U.S. at 131 n.2. The SEC's claim against Lemelson therefore "historically could have been determined exclusively by the executive and legislative branches," making this a case concerning public rights, *id.* at 128, even without *Atlas Roofing*.

### 3.    Article II (Claim 4)

Finally, Lemelson alleges that "[t]he SEC ALJ assigned to superintend and adjudicate [the] SEC's follow-on prosecution against Lemelson . . . enjoys multiple layers of tenure protection" in violation of Article II. Am. Compl ¶¶ 42–43. The SEC originally moved to dismiss this claim on two grounds. *See* Def.'s Mot. Dismiss at 24. First, it argued that the ALJ's removal protections were constitutional. *See id.* And second, it argued that even if they were not constitutional, Lemelson did not plausibly allege "that the ALJ tenure protections caused him any harm—as the

Supreme Court required in *Collins v. Yellen*, 594 U.S. 220 (2021)." *Id.* The SEC has since abandoned any argument that the removal protections are constitutional. *See* Def.'s Reply at 10–11 (citing Notice of Change in Position, ECF No. 16).[1] But it maintains that Lemelson has not plausibly alleged the required harm under *Collins*. *See id.* The Court agrees with the Commission and dismisses Lemelson's fourth claim.

Collins held that "where plaintiffs showed no harm stemming from similar removal protections, there was 'no basis for concluding' that an agency 'lacked the authority to carry out [its] functions' and thus no unlawful action to remedy." *Cortes v. NLRB*, No. 23-cv-2954, 2024 WL 1555877, at *5 (D.D.C. Apr. 10, 2024) (quoting *Collins*, 594 U.S. at 258); *see also K & R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023) ("The courts of appeals have followed the Supreme Court's guidance and denied relief on removal claims when the challengers have not shown that the constitutional violation caused them harm." (collecting cases)).

Collins did not provide clear guidance about the requisite showing of harm. It instead hypothesized two satisfactory situations. *See* 594 U.S. at 259–60. First, where "the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal." *Id.* at 259. And second, where "the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way." *Id.* at 260. Courts of appeals have distilled this guidance in slightly different ways. *See, e.g.*, *Comm. Fin. Servs. Assoc. of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022) ("We distill from these hypotheticals three

---

[1] The Commission filed a notice "to inform the Court that the Acting Solicitor General has decided that the multiple layers of removal restrictions for administrative law judges in 5 U.S.C. § 7521 do not comport with the separation of powers and Article II and that the United States will no longer defend them in litigation." Notice of Change in Position at 1.

requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor."); *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 180 (2d Cir. 2023) (holding "a party must show that the agency action would not have been taken *but for* the President's inability to remove the agency head"); *CFPB v. Nat'l Collegiate Master Student Loan Tr.*, 96 F.4th 599, 615 (3d Cir.) ("There is no notion in this statute that the CFPB would have taken this action but for the President's inability to remove the Director.")

But no matter the standard, Lemelson has not plausibly alleged facts that would meet it. At no point in the Amended Complaint does he mention anything suggesting that the removal protections "would play any role" in SEC decisions. *Cortes*, 2025 WL 1555877, at *6; *see* Am. Compl. ¶¶ 27, 41–43. Lemelson responds by arguing that "[a]t this stage of the litigation (before any discovery or trial), . . . [he] has no burden to prove that the ALJ's tenure protection has inflicted or will inflict compensable harm." Pl.'s Opp'n at 18 (cleaned up). But that does not free him of the obligation to *allege* such harm. The Court therefore dismisses this claim under Rule 12(b)(6) without reaching the constitutional question. *See, e.g.*, *Cortes*, 2025 WL 1555877, at *6; *see also Camreta v. Greene*, 563 U.S. 692, 705 (2011) ("[A] longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (cleaned up)).

**CONCLUSION**

For the foregoing reasons, the Court grants the Defendant's Motion to Dismiss, ECF No. 13. It therefore also denies as moot Lemelson's Motion for Preliminary Injunction, ECF No. 11. *See, e.g.*, *United to Protect Democracy v. Presidential Advisory Comm'n*, 288 F. Supp. 3d 99, 101 (D.D.C. 2017).

A separate order will issue.

 

 

_____

SPARKLE L. SOOKNANAN
United States District Judge

Date:   May 27, 2025